Pfeiffer Brewing Company v. Commissioner.
Pfeiffer Brewing Co. v. Commissioner
Docket No. 28825.
United States Tax Court
1952 Tax Ct. Memo LEXIS 184; 11 T.C.M. (CCH) 586; T.C.M. (RIA) 52179; June 12, 1952
*184 During the taxable years, petitioner paid substantial salaries to its president and its executive vice-president both of whom were executives in another brewery. Held, the compensation paid its executives was a reasonable allowance for the personal services actually rendered. During 1942, petitioner's treasurer made unauthorized withdrawals of petitioner's funds for his own use. A portion of petitioner's loss was recovered under a fidelity bond and a portion by restitution on the part of petitioner's treasurer. Petitioner claimed a loss of $130,000, of which respondent allowed $50,000. Held, the amount of loss sustained by petitioner is $130,000. During 1943, petitioner incurred special legal expenses of $22,000 which respondent disallowed. Held, the special legal services were proximately related to petitioner's business, the fees therefor were reasonable in amount, and constituted ordinary and necessary expenses for the taxable year. J. Marvin Haynes, Esq., 928 Continental Bldg., Washington, D.C., and N. Barr Miller, Esq., for the petitioner. A. J. Friedman, Esq., and Charles Speed Gray, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in tax for the calendar years and in the amounts following: Deficiency
Declared Value
Excess
Year
Income
Excess Profits
Profits
1939
$ 3,584.49
1940
7,322.58
1941
18,570.87
1942
40,554.62
$5,721.55
$45,397.06
1943
5,610.70
169,588.45
The issue are: (1) whether *186 respondent erred in disallowing as a deduction a portion of the compensation paid petitioner's president for each of the taxable years 1939 to 1943, inclusive; (2) whether respondent erred in denying any deduction for compensation paid petitioner's executive vice-president for each of the taxable years 1940 to 1943, inclusive; (3) whether petitioner is entitled to deduct the sum of $130,000 in 1942 as a loss on account of an alleged embezzlement of its funds by one of its officers during 1942; and (4) whether respondent erred in denying petitioner a deduction of $22,000 in 1943 for legal expenses. At the hearing respondent conceded error in increasing petitioner's net income for 1942 by $50,000 received from a bonding company on account of the alleged embezzlement. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found are incorporated herein. Petitioner is a corporation organized under the laws of the State of Michigan on February 5, 1926. Its principal office is located in Detroit, Michigan, and its returns for the taxable years were filed with the collector of internal revenue at Detroit. During the taxable years petitioner's books of account *187 were kept, and its tax returns were filed on a calendar year basis in accordance with the accrual method of accounting. Petitioner is engaged in the manufacture and sale of malt beverages. It manufactures and markets one principal brand of beer in bottles, cans and kegs. Its malt beverage products were first produced and placed on the market on or about May 15, 1934. [Facts Relating to the Compensation Issues] In 1933, prior to petitioner's entry into the beer business, its brewing plant was in a run-down condition. Part of the building housing the plant was without a roof. Its brewing equipment was meager; part of it was old and nearly worn out. In July 1933 petitioner had pending before the Michigan State Liquor Commission an application for a license to engage in the manufacture of beer within the State. The Commission had indicated a license would be granted to petitioner only if its plant was placed in good operating condition and the business shown to be adequately financed. In order to comply with the requirements of the Michigan Liquor Commission, arrangements were made with Chicago stockbrokers for financing the business. The Chicago brokers agreed to purchase *188 192,412 shares of stock from petitioner's majority stockholders and to purchase also 370,588 newly issued shares. The brokers agreed to place the proceeds of the sale of these shares in escrow and pay therefrom the petitioner's outstanding debts and make the balance of the proceeds available to petitioner for renovation of its plant and equipment. The brokers failed to carry out their agreements and petitioner was left without funds. The Michigan Securities Commission prohibited petitioner from making further efforts to sell stock to the public. It was therefore necessary to find private financing for petitioner. After efforts to interest a number of different persons in the financing of petitioner had failed, Alfred Epstein, now president of petitioner, agreed to come into the business and to invest his personal funds and credit. Epstein immediately advanced about $40,000 to petitioner and took over the defaulted obligation of the Chicago stockbrokers to buy the stock of the old stockholders of petitioner. On the basis of Epstein's agreement to reorganize the petitioner, furnish the capital and take part in starting the petitioner's brewing business, the Michigan Liquor Commission *189 issued a license to petitioner. In addition to advancing his personal funds to petitioner early in 1934, Epstein used his personal credit to acquire machinery and supplies for petitioner's entry into the brewing business. Epstein and Carleton S. Smith, then secretary-treasurer of petitioner, called upon various suppliers and persuaded them to furnish supplies and equipment under deferred payment plans with little or no down payments. Epstein endorsed petitioner's notes for equipment and personally guaranteed the payment of other credit obligations undertaken by petitioner. Without this financial assistance petitioner would have been unable to enter the beer business. Epstein was elected a director and vice-president of petitioner on March 21, 1934. He took full charge of petitioner's business at that time. In March 1936 he was elected president of petitioner. He has served continuously as president and general manager of petitioner since that time. In the period from May 15 to December 31, 1934, petitioner's sales amounted to more than $2,800,000 and its net income before taxes was $512,933.43. At the commencement of petitioner's brewing business in 1934, its capacity for production *190 was 120,000 to 150,000 barrels per year. By 1939 the capacity of petitioner's plant had been increased by new construction to 550,000 barrels per year. The book value of petitioner's buildings, land, improvements, machinery and equipment increased from $861,778 at December 31, 1934 to $1,722,671 at December 31, 1938. Petitioner's volume of sales of beer in the State of Michigan in comparison to other breweries manufacturing and selling their products in the State of Michigan is as follows: Pfeiffer Brewing Company
Total
Percentage
Sales
Michigan Sales, All
Michigan
of Total
Position
Year
Breweries Barrels
Sales Barrels
Mich. Sales
in Mich.
1937
3,090,037
300,770
9.7
Third
1938
2,629,841
379,496
14.4
Second
1939
2,673,326
390,832
14.6
Second
1940
2,647,650
398,429
15.0
Second
1941
2,643,707
412,211
15.6
Second
1942
2,847,721
483,587
16.98
Second
1943
3,171,148
482,329
15.2
First
1944
3,395,366
469,981
13.8
First
1945
3,475,038
489,963
14.1
First
For the taxable years 1934 - 1943, inclusive, petitioner's sales, net income before Federal income taxes, dividends, and earned surplus at December *191 31 (all amounts rounded to the nearest dollar) were as follows: Net Income
Cash
Earned
Year
Sales
Before Taxes
Dividends Paid
Surplus
1934
$2,814,125
$ 512,933
$ 448,933
1935
6,019,410
1,119,154
$562,347
821,131
1936
3,974,552
466,542
468,494
743,725
1937
4,755,586
401,400
257,672
800,645
1938
5,903,471
722,599
214,726
1,217,266
1939
6,203,787
757,527
214,726
1,618,993
1940
6,365,044
611,726
429,453
1,645,949
1941
6,985,343
678,039
322,090
1,785,833
1942
8,126,844
728,957
214,726
2,010,650
1943
9,176,724
1,060,622
322,090
2,192,727
As president and general manager of petitioner during the taxable years, Epstein personally directed and supervised all phases of petitioner's brewing business. He supervised production, distribution, advertising, financing, labor relations, and the brewing of the beer. He planned and supervised petitioner's plant expansions without the aid of architects. At his insistence petitioner installed a laboratory for testing petitioner's product, and he checked the daily laboratory reports to make sure that the quality, uniformity, and consistency of the beer were maintained. *192 He designed petitioner's distribution trucks so that packages for delivery might be more easily and quickly loaded and unloaded. On behalf of petitioner Epstein successfully negotiated with the Bank of the Manhattan Company, New York City, and other financial institutions for bank loans in the amount of $500,000 or more. The Bank of the Manhattan Company was motivated to make substantial loans to the petitioner by reason of its complete faith in the statements of Epstein and its confidence in his management. During 1939-1943, inclusive, Epstein performed many of the duties normally performed by a good brew master. The brew master in petitioner's plant served as superintendent of the brewing department; he did not make the formula for Pfeiffer beer, and his compensation during the taxable years ranged from $10,000 to $15,000 per year. A good brew master for petitioner's plant during these years would have received compensation of $30,000 to $40,000 per year. Epstein devoted substantially more than the normal working hours to petitioner's business during the taxable years. He worked regularly at the plant on Saturdays and Sundays as well as on the other days of the week. In the *193 years 1940 through 1943, in addition to his employment by petitioner, he served as chairman of the board of directors and as an officer of Drewrys Limited, U.S.A., a brewery located at South Bend, Indiana, at compensation of $1,500 in 1940, $16,500 in 1941, and $22,500 annually in 1942 and 1943. South Bend, Indiana, is about one hour's flying time from Detroit, and Epstein visited the Drewrys' plant about once a week. Epstein had a reputation in business and financial circles as an outstanding man in the brewing industry. In 1937 a Pittsburgh brewing company offered him employment at a salary of $50,000 per year, plus annual bonuses and an option on stock of that company. This offer was substantially in excess of what petitioner was paying him, but Epstein rejected the offer because he believed he had an obligation to petitioner and its stockholders. At that time Epstein had a five-year contract with petitioner entered into on May 29, 1936. Carleton S. Smith was elected executive vice-president of petitioner, effective as of July 1, 1940, and thereafter served continuously in that capacity through the taxable year 1943. He was first employed by petitioner as secretary-treasurer *194 from July, 1933, to the latter part of 1934, after having served as a public accountant with the firm of S. Leidesdorf & Company, certified public accountants, from 1923 to 1928, and as secretary-treasurer of the Copeland Products Company of Detroit from 1928 to 1933. Smith was elected a director of petitioner in 1933 and remained continuously as a director until July, 1949. About the end of 1934 Smith left the employ of petitioner to reorganize a brewing company at Davenport, Iowa. The company was reorganized into the Zoller Brewing Company, and Smith became its president and general manager. In 1936, after training another man to take his place, Smith resigned and moved to South Bend, Indiana, where he took charge of the reorganization of the Muessel Brewing Company. The latter company was at that time in receivership under section 77B of the National Bankruptcy Act. Under his direction this company was reorganized into Drewrys Limited, U.S.A.Drewrys commenced business in the latter part of 1936 with a production capacity of approximately 100,000 barrels per year. Its net sales volume in 1937 was approximately $1,300,000; in 1940 it was approximately $3,500,000; and in 1950 its *195 net sales exceeded $11,000,000. Smith has served as president of Drewrys Limited, U.S.A., from 1936 to the present time. In that position he supervised and directed all phases of the brewing business, including production, distribution and sales, purchase of supplies and installation of equipment, advertising and sales promotion, and all financial affairs of that company. Petitioner, through its president, Alfred Epstein, had attempted as early as 1939 to reemploy Smith as an executive officer. Petitioner needed the services of an experienced brewery executive to assist its president with all of the various problems of brewery management. Smith rejected petitioner's offer in 1939 because he had not at that time been able to train other employees of Drewrys to perform his duties for that company. In 1940 he commenced to train a Drewrys' employee who could perform the duties of vice-president and general manager in his absence. By 1941 Smith believed that the management organization of Drewrys was sufficiently well established and trained that he could devote a substantial part of his time to other duties. After Smith became executive vice-president of petitioner on July 1, 1940, he *196 served for approximately one year on a part time basis, retaining his residence in South Bend, Indiana. His annual salary was fixed at that time at $3,000 per year. At the end of 1940, petitioner's board of directors voted him a bonus which made his 1940 compensation from petitioner total $6,500. In July, 1941 Epstein persuaded Smith to move his residence to Detroit and to undertake important duties with petitioner. At that time petitioner increased Smith's salary to $18,000 per year. From July 1940 to July 1941 Smith assisted petitioner in its program of plant expansion. He advised and assisted with respect to the layout of the physical equipment of the plant, determined the specifications for new equipment, and negotiated the purchase of such new equipment. After he moved to Detroit, Smith acted as assistant to Epstein. He was in full charge of petitioner's plant whenever Epstein was out of town. He devoted a considerable part of his time to financial problems of the petitioner, engaged in the purchase of materials, and advised with respect to all operating problems of petitioner's plant. Smith had had prior experience with machines for the drying of spent grain, which are employed *197 for the purpose of preparing the grain used in brewing for resale as livestock feed. Up to that time petitioner had never used spent grain dryers. Smith persuaded petitioner to install such a machine in 1942. As a result of the operations of the machine, petitioner's net profits were increased by about $50,000 annually. Smith also recommended and arranged for the installation of yeast drying equipment used to salvage and sell yeast which would otherwise have been wasted. The installation and production of the yeast drying equipment increased petitioner's profits approximately $5,000 annually. In 1941, as a result of the national defense program, restrictions were imposed upon the use of metal crowns as beer bottle caps. The governmental restrictions prevented the use of metal crowns unless they could be made from scrap metals rejected for national defense use. Through Smith's efforts, rejected scrap metal was located, machinery was procured for the processing of such metals, and manufacturers were persuaded to use it in making bottle crowns for petitioner. Petitioner was enabled thereby during the war years to continue the sale of bottled beer, which is more profitable than draught *198 beer. Smith also introduced the canning of beer at petitioner's plant in 1943. As president and general manager of Drewrys Limited, he had obtained considerable experience in the canning of beer and had become well acquainted with the suppliers of cans and canning equipment. Through these business connections Smith was able to obtain canning equipment and a substantial supply of cans for petitioner in 1943. Because of the shortages of canning equipment and metal cans, petitioner would not have been able to acquire these supplies without the services of Smith. Canned beer is a more profitable product than draught beer. During the years 1940 to 1943, inclusive, Smith divided his time of employment between Drewrys Limited, U.S.A., and petitioner. He was compensated by Drewrys for his personal services as follows: Compen-
Year
Office
sation
1940
President
$12,000
1941
President
29,000
1942
President
27,500
1943
President
27,500 After he moved to Detroit, Smith spent about 60 per cent of his time at petitioner's plant and about 40 per cent of his time at Drewrys' plant. Ordinarily he worked at one or the other of the plants on Saturdays and Sundays *199 as well as the other days of the week. In connection with the procurement of supplies and equipment and solving mechanical-production problems, he found that he could combine his duties for both companies. The distance between Detroit and South Bend is approximately 186 miles. Smith traveled between the two cities variously by automobile, train, or airplane. Smith is generally regarded in business and financial circles as an extremely able brewery executive. Late in 1942 Smith was offered the position of president and general manager by a Milwaukee brewery at a salary of $50,000 per year. He rejected the offer because he did not want to live in Milwaukee and because he had an investment in Drewrys which he desired to take care of. In 1943 the Brewing Corporation of America was negotiating for the purchase of assets of Drewrys. One of the stipulations made by Brewing Corporation of America was that Smith should become general manager at $50,000 per year. Smith agreed, but Drewrys' board of directors rejected the offer. In 1946 Smith returned to the exclusive employ of Drewrys at an annual salary of $50,000. During the taxable years 1939 to 1943, inclusive, petitioner paid the *200 following amounts of compensation to Epstein and Smith and deducted such amounts on its tax returns for these years as compensation paid for personal services: Carleton S.
Smith,
Alfred Epstein
Executive
Year
President
Vice-President
1939
$44,000
1940
48,000
$ 6,500
1941
62,000
17,125
1942
62,000
30,000
1943
62,000
23,000
In determining the deficiencies herein, the respondent allowed compensation for Epstein's services in the amount of $25,000 per annum and disallowed the balance. Respondent disallowed the entire compensation paid to Smith for personal services in 1940 1943, inclusive. The amounts of compensation paid to Epstein and Smith during the years 1939 1943, inclusive, were determined by petitioner's board of directors. Although Epstein was a director of petitioner during the taxable years, he did not participate in that portion of the directors' meetings during which his employment contracts were under consideration. Salary payments made to Epstein during the taxable years were made by petitioner pursuant to employment contracts approved by petitioner's board of directors and executed by Epstein and petitioner under dates *201 of May 29, 1936, June 15, 1940, and January 13, 1941. During the years 1939 to 1942, inclusive, petitioner's board of directors was composed of L. H. Buhs, Louis A. DeHays, Alfred Epstein, Harold Richeson, and Carleton S. Smith. On January 9, 1943, Merlin Wiley took the place of L. H. Buhs on the board of directors and served for a short period. M. A. Yockey became a director in 1943. At no time during the taxable years did the shares of stock owned by the members of the board of directors of petitioner exceed six per cent of the 429,053 shares of petitioner's stock outstanding. Epstein's and Smith's maximum stockholdings during the taxable years, stated as a percentage of total shares, were 2.7011 and 1.554, respectively. During these years there were approximately 4,000 shareholders of petitioner's stock. The capital stock of the petitioner has been listed on the New York Stock Exchange and the Detroit Stock Exchange since 1935. During each of the taxable years, petitioner's shareholders were advised by the annual reports, by notices of annual meeting, and by proxy statements, of the total compensation paid by petitioner to Epstein and Smith and of the number of shares of stock *202 owned by each member of the board of directors. To the knowledge of petitioner's president, no stockholder ever filed objection to the compensation paid Epstein or Smith during the taxable years. At the annual meeting of the stockholders of petitioner on April 19, 1943, T. M. Rinehart, a stockholder of petitioner and many other corporations, including breweries, stated: "* * * I have been close to this brewery and its personnel, and I think the stockholders in Pfeiffer Brewing Company really owe a debt of thanks to its president, not only for the success that the brewery itself has made through his keen business judgment, but also the treatment that the stockholders themselves have received from his hands. They have not been treated just as a person who has an investment, small or large, here; you have treated us as a partner, and I think we appreciate it; * * *" As a part of his remarks, Rinehart offered the following resolution, which was adopted without a dissenting vote: "RESOLVED That the stockholders of Pfeiffer Brewing Company in annual meeting assembled, do sincerely commend the administration of the company's business under the able management of its president, Alfred *203 Epstein. From the beginning of his term of office in 1935 to this day, he has given the company services of the highest quality, and a business judgment that has proved him among the most successful of the city's executives. Upon the crumbled foundations of an almost lost tradition, he has moulded one of the most successful industries in Detroit, completely rebuilt its plant, increased its output year by year, made its product second to none in the United States, freed the company from debt, and given it credit unimpaired. In all this he has never forgotten his stockholders. We appreciate it deeply, and bespeak for him our continued confidence and trust." A total of 229,931 shares of stock was represented at this annual meeting. One person, holding a proxy for 3,800 votes, asked to be recorded as not voting for the resolution. On or about July 20, 1939, the board of directors of Drewrys granted Smith an option for five years to purchase 100,000 shares of its stock. On or about August 24, 1939, Smith gave Epstein one-half of the option. Epstein paid nothing for his half interest in the option, and Smith received no payment, directly or indirectly, from Pfeiffer Brewing Company on *204 account of his transfer of a half interest in the option to Epstein. During 1944 Epstein and Smith exercised their rights under the option and took up the Drewrys' stock. In Schedule F of its income tax returns for 1940 to 1943, inclusive, petitioner erroneously reported that Epstein devoted all his time to his duties as president of the petitioner. In the same schedule for the years 1942 and 1943, petitioner erroneously reported that Smith devoted all of his time to his duties as executive vice-president. Petitioner was one of the most efficiently operated members of the brewing industry. Its net profits, whether based on a percentage of net sales or a percentage of net worth, exceeded the industry's net profits, percentagewise, for each of the taxable years. Its costs of operation, i.e., selling, general, and administrative expenses including salaries to executives, were less than the industry's costs, percentagewise, for each taxable year. It paid Epstein one of the highest salaries in the brewing industry. The results achieved for petitioner by Epstein and Smith justified the salaries paid them. The compensation paid Epstein and Smith during the respective taxable years was *205 a reasonable allowance for the personal services rendered. [Facts Relating to the Loss Issue] On or about January 9, 1943, Lybrand, Ross Bros. & Montgomery, independent public accountants, in the course of making their annual audit of the books and records of petitioner, discovered that the latter's vice-president and treasurer, Lloyd H. Buhs, had made withdrawals from petitioner's funds during the year 1942 and in January, 1943, in the total amount of $241,500. On the date of discovery, $216,000 was still missing and unaccounted for, of which $15,000 had been withdrawn after December 31, 1942, and $201,000 had been withdrawn during 1942. These withdrawals were unauthorized by petitioner's board of directors and were made without the knowledge of petitioner's president or its executive vice-president. With the assistance of the accounting firm, petitioner undertook an immediate investigation which revealed that the moneys had been withdrawn by checks on petitioner's account with the National Bank of Detroit, payable either to "C. K. Wright, Petty Cash" or to "Brinks, Inc., Petty Cash" over the signatures of L. H. Buhs and C. K. Wright. At that time C. K. Wright was the office *206 manager of petitioner. The investigation revealed that Buhs had received all of the missing funds and that Wright had received none of them. Prior to January 20, 1943, Buhs was the record owner of 7,000 shares of the 7,200 outstanding shares of capital stock of Engineering Specialties Corporation, Detroit, Michigan, hereinafter referred to as Engineering. Engineering was engaged in the business of operating a tool and die plant, and in the manufacture of plastic molds, the manufacture of end-connectors for tanks and in the milling and polishing of aerial torpedo propellers for the Naval Torpedo Station, Providence, Rhode Island. The latter work was done under a Navy contract, and Engineering had executed a performance bond in connection therewith in the sum of $60,000. Petitioner's investigation of Buhs' activities revealed that a substantial part of the cash withdrawn from petitioner had been advanced to Engineering, the books and records of which showed that as of December 31, 1942, Engineering was indebted to Buhs for advances in the sum of $133,905.73. Between January 1 and January 7, 1943, the following changes occurred in the amount of the Account Payable by Engineering to *207 Buhs: Engineering Specialties Corporation
Account Payable to L. H. Buhs
December 31, 1942, balance of ac-
count
$133,905.73
Jan. 5, 1943, paid in by
Buhs
$20,000.00
Jan. 7, 1943, withdrawn
by Buhs
7,736.72
Net increase
12,263.28
Balance of Account
$146,169.01
On January 20, 1943, Buhs transferred and set over to petitioner all of his right, title, and interest in Engineering stock "together with all claims of every kind I have or may have against" Engineering as part consideration for his obligation to petitioner "for its funds used by me, illegally and unauthorized, * * *." So far as petitioner could ascertain by its investigation, neither Buhs nor Wright had at that time any other available assets which petitioner could recover and apply against the withdrawals. The 7,000 shares of stock standing in Buhs' name on Engineering's stock-record book were cancelled, under date of January 20, 1943, and new stock certificates therefor were issued to petitioner. Thereafter, and until the dissolution of Engineering in 1948, the latter was operated under the direction and control of the petitioner. Petitioner was indemnified under a fidelity *208 bond issued by Standard Accident Insurance Company, Detroit, Michigan - "* * * against any loss of money or other personal property * * * belonging to the Insured or in which the Insured has a pecuniary interest, * * * which the Insured shall sustain, the amount of indemnity on each of such Employees being Twenty-Five Thousand and no/100 Dollars ($25,000.00) through larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction, wilful misapplication, or other fraudulent or dishonest act or acts committed by any one or more of the Employees * * *." On March 17, 1943, Standard Accident Insurance Company paid petitioner $50,000 on account of such company's liability under the aforementioned indemnity policy based on the acts of Buhs and Wright. Lloyd H. Buhs was tried, before a jury, on the charge of embezzlement in the Recorder's Court of the City of Detroit, and on May 4, 1944, was found not guilty. On February 8, 1943, the accounting firm of Lybrand, Ross Bros. & Montgomery made its first report to petitioner on an examination of the accounts of Engineering, as of December 31, 1942. The report showed the following balance-sheet condition of Engineering at December 31, 1942: *209 Total Assets
$398,263.44
Total Current Liability
$430,866.94
Less L. H. Buhs' Ad-
vances (Assigned to
petitioner)
133,905.73
296,961.21
Balance
$101,302.23 The report showed that the deficit in the earned-surplus account exceeded the capitalstock account by $32,603.50, and that the financial statements were subject to adjustment because of listed items which were unsettled at the date of the report. On its 1942 income and excess profits tax return, filed on March 15, 1943, petitioner deducted $50,000 as a loss "by fire, storm, shipwreck, or other casualty, or theft." The deduction was explained as follows: Item 24: Unauthorized and illegal withdrawals
from Treasury by L. H. Buhs,
Treasurer, and Charles K. Wright,
Office Manager, as at December 31,
1942
$201,000
Estimated realizable value of Com-
pany's claims for recovery (in-
cluding the proceeds of fidelity
insurance)
151,000
Loss by Embezzlement
$ 50,000
On January 20, 1943, Engineering's work on hand included the Navy contract for propellers, amounting to approximately $700,000, only a small percentage of which had been completed. Engineering was without funds to *210 meet its weekly payroll, and petitioner had to decide whether to liquidate Engineering and accept the $60,000 performance-bond liability or to finance its continued operation and realize as much as possible on the stock and claims assigned to it by Buhs. Petitioner decided to finance Engineering and advanced $10,000 to meet Engineering's current payroll. Loans of $200,000 and $100,000 were obtained from the Bank of Manhattan Company, New York, N. Y., for Engineering on February 4, 1943, and March 26, 1943, by petitioner's guarantee of the loans and the subordination of its own claim of $146,169.01 against Engineering to the claims and demands, present and future, of the Bank of Manhattan. Shortly after it decided to continue the operations of Engineering, petitioner found that both the technical personnel and the machinery and equipment of Engineering were inadequate for the performance of the Navy contract and other work which had been undertaken. Petitioner replaced the technical and supervisory staff of Engineering and discontinued the end-connector business which had been responsible for about half of Engineering's losses. The new technical staff found that the propeller work-in-process *211 was seriously defective and did not meet the specifications of the Navy contract. Sometime after February 9, 1943, the Naval Torpedo Station began to reject and return to Engineering propellers which had been completed and shipped by Engineering in 1942 under its Navy contract. In their first report on Engineering as of December 31, 1942, the certified public accountants included the defective work-in-process and the rejected propellers in Inventories and Accounts Receivable, respectively, at their book value, upon the theory that the work done on the propellers was satisfactory. The report estimated the cost of reworking the propellers, and pointed out that a portion of the Accounts Receivable, representing amounts due from the United States Government, had not been confirmed. The certified public accountants made a further examination and report on the operations of Engineering for the nine-month period ended September 30, 1943. In its first report on Engineering, the deficit account showed a deficit at December 31, 1942, of $104,603.50. In the second report, adjustments applicable prior to January 1, 1943, relating principally to propellers under the Navy contract, resulted in *212 an adjusted deficit as of December 31, 1942, of $183,954.52. The revised balance sheet, as of December 31, 1942, showed that the deficit, as adjusted, exceeded the capital-stock account by $111,954.52 ($183,954.52 - $72,000). The adjustments made in Engineering's revised balance sheet as of December 31, 1942, show that the second report decreased total assets by $55,538.61 and increased liabilities by $23,812.41, so that Engineering's balance (assets over liabilities) as of December 31, 1942, was $21,951.21, instead of $101,302.23 as shown by the first report, dated February 8, 1943. The revised balance sheet shows: Total Assets
$342,724.83
Total Current Liability
$454,679.35
Less L. H. Buhs' Ad-
vances
133,905.73
320,773.62
Balance
$ 21,951.21
The certified public accountants explained the adjustments made in arriving at Engineering's balance of $21,951.21, as of December 31, 1942, in part as follows: "* * *
"Several major adjustments have been made in the accounts during the period of our review applied as corrections of the amount of the deficit previously recorded as at January 1, 1943. These adjustments arose from the business transacted *213 by the former management and they represent losses and expenses incurred prior to January 1, 1943 or corrections of the recorded amounts of assets and liabilities as at that date. These adjustments are set forth in the statement of the Deficit Account and the charges (net amount, $79,351.02) are excluded from the Income Account. The principal adjustments pertain to the propeller contract with the U.S. Navy Department and result from the spoilage of propeller forgings furnished by the Navy, which spoilage was not previously recognized in the accounts. Part of this spoilage was applicable to propellers which had been shipped prior to December 31, 1942 and was not ascertained until 1943 when the propellers were rejected by the Navy and returned to the company. "We have made a detailed investigation of the available records of propeller forgings and have satisfied ourselves that these retroactive adjustments are substantially correct. * * *." On December 15, 1943, petitioner filed amended income and excess profits tax returns for its taxable year 1942 and claimed a loss from the withdrawal of its funds by Buhs and Wright in the amount of $130.000 instead of the amount of $50,000 claimed *214 on its original return for 1942. Petitioner computed the loss claimed on its amended returns as follows: Unauthorized and illegal withdrawals
as at December 31, 1942
$201,000
Estimated realization from as-
sets of Engineering
$21,000
Proceeds from fidelity insur-
ance
50,000
71,000
Loss by Embezzlement
$130,000
In the amended return, petitioner gave the following explanation for increasing the amount of the loss: "This amended return is filed in order to correct the deduction for the loss arising from the defalcation of a former officer of the taxpayer. In the original return deduction was made for an estimated loss of $50,000. This estimate was erroneous and the loss should have been $130,000." The net assets of Engineering at December 31, 1942, available to pay Buhs' claim, against Engineering, which he subsequently assigned to petitioner as part consideration for his $201,000 of unauthorized withdrawals, amounted to approximately $21,000. All the events fixing the value of the assets of Engineering at December 31, 1942, which were reflected in the revised balance sheet prepared by the certified public accountants as of that date, had occurred *215 prior to January 1, 1943. On or about March 16, 1942, Epstein loaned Buhs $50,000. This loan was evidenced by Buhs' note for $50,000, due March 16, 1943, with interest at four per cent. As collateral for the loan, Buhs endorsed over to Epstein a note for $50,000 executed by Engineering in favor of Buhs. By December 31, 1942, payments to Epstein totaling $10,000 had reduced the amount of the loan to $40,000. Epstein voluntarily subordinated his claim against Engineering to the claims of petitioner. Pursuant to the provisions of the Securities Exchange Act of 1934, as amended, the petitioner, on March 22, 1943, notified the Securities and Exchange Commission of its acquisition of the capital stock of Engineering. Acquisition of Buhs' interest in Engineering was stated to be "in partial restitution of funds aggregating $216,000 illegally and improperly withdrawn from Pfeiffer Brewing Company; * * *. In the opinion of the Board of Directors of Pfeiffer Brewing Company, the realizable equities so acquired in Engineering Specialties Corporation was $101,000." Petitioner further stated it believed "a reasonable profit can be made after certain changes in tooling and management." After *216 the revised balance sheet at December 31, 1942, was prepared by its accountants, petitioner notified the Securities and Exchange Commission on February 12, 1944, of the revaluation of Engineering's assets on February 9, 1944, retroactive to December 31, 1942. Such notice explained that the estimated amount of misappropriated funds recoverable as of December 31, 1942, had been reduced from $151,000 to $71,000, and that amended income and excess profits tax returns had been filed reflecting this additional tax deduction in 1942 of $80,000 for loss ariving from Buhs' defalcation. During the period 1943 to 1948, inclusive, when petitioner operated Engineering as its subsidiary, total profits of $142,016.25 were realized and losses totaling $67,413.46 were sustained, or a net profit for the period of $74,602.79. Upon liquidation of Engineering in 1948, petitioner realized $59,302.94 on the net assets available at December 31, 1942. If Epstein had not subordinated his claim, petitioner would have received only $19,302.94 upon the liquidation of Engineering's net assets. Petitioner realized nothing on the stock it held in Engineering. Petitioner suffered a loss in 1942 in the amount of *217 $130,000, due to Buhs' unauthorized withdrawal of its funds. [Facts Relating to Legal Expense Issue] In its income tax return for 1943, petition deducted legal and professional fees in the amount of $53,923.98. In his deficiency notice, respondent stated that he had disallowed $22,000 of such deduction for the following reason: "It has been held that the amount claimed by you as Special Legal Expense for $22,000, is neither ordinary or [nor] necessary and has been disallowed." Petitioner has been a client of the law firm of Wiley, Streeter & Meyer since about 1934. Merlin Wiley, a former Attorney General of the State of Michigan, was petitioner's legal counsel and served on its board of directors during 1942 and 1943. During 1943 Wiley devoted his time almost exclusively to petitioner's legal problems. In connection with the Buhs' matter, Wiley represented petitioner before the Securities and Exchange Commission and the Board of Governors of the New York Stock Exchange. He also looked after petitioner's interests in the investigation of the Buhs' matter by the Federal Bureau of Investigation. During 1943 Wiley successfully represented petitioner before the Alcohol Tax Unit *218 and the Department of Justice in connection with a claim of nearly $500,000 asserted against petitioner. Wiley submitted a bill to petitioner for his personal legal services during 1943 in the amount of $22,000. The special services rendered petitioner by its counsel during 1943 were proximately related to the conduct of its business. Its liability to pay $22,000 for such services arose during the taxable year 1943. Under petitioner's method of accounting, such legal fee constituted ordinary and necessary expenses of the taxable year 1943. Opinion RICE, Judge: The issues will be discussed in the order in which the facts have been found. Compensation Issues Section 23 (a) (1) (A) of the Internal Revenue Code provides that in computing net income there shall be allowed as deductions all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. The parties disagree as to what amount is a reasonable *219 allowance for the personal services actually rendered by Epstein, and whether any amount should be allowed for the personal services actually rendered by Smith. The dispute as to Epstein involves each taxable year; the dispute as to Smith involves the taxable years 1940-1943, inclusive. It is well established that the question as to what constitutes a reasonable allowance for compensation for personal services actually rendered is primarily a question of fact. Trust of Bingham v. Commissioner, 325 U.S. 365, 370 (1945); Hunt Foods, Inc., 17 T.C. 365 (1951); appealed, C.A. 9 (1952). We have found as a fact, as to each taxable year, that the amounts paid to petitioner's two chief executives constituted reasonable compensation for the personal services actually rendered to petitioner. In view of the time and attention given to these issues in the testimony, the stipulated facts and exhibits, the documentary evidence, and the briefs filed by the parties, we will discuss the reasons for our determination in some detail. Respondent's regulations 111, section 29.23 *220 (a)-6, state that the test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. His first illustration of a practical application of this test, showing nondeductibility, is where a corporation uses an ostensible salary to distribute a dividend on its stock. It is then pointed out that this situation is likely to occur where the corporation has only a few shareholders, practically all of whom draw salaries. Clearly, the present circumstances do not represent any attempt by petitioner to distribute dividends in the guise of salary payments. Petitioner had approximately 4,000 stockholders during each of the taxable years; and neither Epstein nor Smith, at any time, held as much as three per cent of the more than 400,000 shares of stock outstanding. The record shows that petitioner's stockholders were fully advised of the compensation paid its officers and the amount of stock held by each. The minutes of the directors' meetings show that Epstein was employed on a contractual basis and that the compensation of each officer was fixed after full and careful consideration by the directors. The minutes of the annual *221 meeting of the stockholders in 1943 show their enthusiastic endorsement of Epstein's management and achievements in conducting petitioner's business. Since Smith was Epstein's right hand during 1940 to 1943, inclusive, it is reasonable to assume that his efforts and abilities were also reflected in petitioner's business accomplishments. Another illustration of the nondeductibility of compensation payments, set forth in respondent's regulations, is a situation where an ostensible salary may be part payment for property. Respondent asserts that Smith and Epstein used the finances of petitioner to discharge their mutual personal obligations. He says that the two men had so completely entrenched themselves with petitioner and Drewrys Limited, U.S.A., that they used the finances of the two breweries to pay off and discharge their mutual personal obligations in the guise of salaries. Respondent points out that in 1939 Smith gave Epstein an option to purchase 50,000 shares of Drewrys' stock for which Epstein personally paid nothing to Smith. Respondent points out further that shortly thereafter Smith was placed on petitioner's payroll, and that it is altogether probable that at least part *222 of the salary Smith received from petitioner was indirect payment for the option Smith gave Epstein. In other words, says respondent, Epstein used petitioner to discharge his personal obligation to Smith which arose from the stockoption transaction. After making these charges, respondent admits the absence of proof by stating that "such matters are not readily susceptible of precise proof," and "are established rather by applying inference and probabilities to the disclosed facts and circumstances." We can see no basis for using inferences and probabilities on the compensation issues. Smith's testimony is straightforward and to the point that the option to purchase was given to him; that he gave half of it to Epstein, who had no connection at the time with Drewrys; and that they exercised the option in 1944 just prior to its expiration. To the direct question of whether he received any payment directly or indirectly from petitioner on account of transferring the option to Epstein, Smith answered an unqualified "No, Sir." We have no reason to doubt his testimony. If we were drawing inferences from the facts and circumstances, we would infer that Epstein and Smith worked to solve Drewrys' *223 business problems with the idea that a successful business would make their option to purchase Drewrys' stock more valuable. There is no convincing evidence in this record that any amount of the compensation paid to Smith represented part payment for the option to purchase 50,000 shares of Drewrys' stock. Respondent also contends that the salaries paid Epstein and Smith were excessive when compared with salaries paid for like services by Goebel Brewing Company of Detroit, twenty-seven other breweries throughout the country, five breweries considered to be petitioner's direct competitors, and six breweries with volume of sales comparable to petitioner's. In his proposed findings, respondent submitted numerous tables compiled from stipulated data on profits and operations contained in the annual reports of 27 members of the brewing industry filed with the Securities and Exchange Commission for the years 1939-1943, inclusive. We have analyzed and compared the stipulated data contained in the annual reports of members of the brewing industry. We have compiled tables therefrom which compare petitioner's operations with Goebel Brewing Company and other representatives of the brewing industry. *224 We have also compared our compiled tables with 10 or more tables submitted by respondent as a part of his proposed findings of fact. There is no doubt but that petitioner paid its executives top salaries in the industry. And likewise there is no doubt but that petitioner made more profits, year in and year out on its operations, percentagewise, than any member of the industry brought to our attention as a proper comparative. Petitioner, it appears, paid top salaries and secured therefor top performance from its president and its executive vice-president, Epstein and Smith, respectively. Respondent stresses the operations of Goebel Brewing Company of Detroit, as compared with petitioner during the taxable years, and concludes therefrom that Epstein, on a percentage of net-sales basis, received excessive compensation of $8,912, $17,499, $36,381, $31,921, and $26,444 for the respective taxable years 1939 to 1943, inclusive. Without detailing each year involved, we will compare the results of the two businesses for the five-year period. Their net sales were almost the same - $20,531,000 for Goebel against $20,716,000 for petitioner. Petitioner's selling, general, and administrative expenses *225 (of which executive salaries are a part) were less than Goebel's, being $4,957,000 against $5,933,000. Petitioner's operating profit and its net profit exceeded Goebel's in both categories, i.e., $3,837,000 against $3,218,000, and $2,526,000 against $2,050,000. Goebel's net profit as a percentage of net sales for the five years was 10 per cent, while petitioner's was 12.2 per cent. Another interesting indication of the efficiency with which Epstein and Smith operated petitioner's business is a comparison of selling, general, and administrative expenses, etc., as a percentage of net sales for the five-year period with Goebel's. The latter's expenses totaled 28.9 per cent of the net sales, while petitioner's totaled 23.9 per cent of its net sales. In addition to the foregoing, it must be remembered that Epstein's and Smith's services saved the petitioner the salary of a brew master, estimated at a cost of $30,000 to $40,000 a year, and converted waste products into income-producing by-products of its business. Smith, in particular, was helpful in securing scrap metal and machinery whereby petitioner could continue during the war years with its sale of bottled beer. His connection also *226 enabled him to obtain canning equipment and a supply of cans for petitioner in 1943. Bottled and canned beer are more profitable products than draught beer. The record also contains evidence that the ability of Epstein and Smith was recognized by the banking and investment fraternity. Offers from other breweries for their services at an increased compensation show that their reputation in the brewing industry was well-known and established. We can find nothing fatal to the petitioner's claims here in the fact that they were employed by and served as executives of another brewery during a part of the taxable years. Apparently both breweries prospered from their services, but the important fact is not whether they rendered services to two breweries but whether the compensation received from the petitioner was a reasonable allowance for the personal services that they actually rendered. The compensation paid Epstein and Smith for each of the taxable years was reasonable, and petitioner is entitled to deduct the amounts paid as ordinary and necessary business expenses under section 23 (a) of the Internal Revenue Code. Loss Issue The basic question on this *227 issue is the amount of the loss sustained by petitioner during the taxable year 1942 which is deductible under section 23 (f) of the I.R.C.[1] In computing the deficiency for 1942, the respondent not only disallowed the loss of $50,000 claimed on petitioner's original return for 1942, but added to petitioner's income the proceeds of the fidelity bond ($50,000) paid to petitioner on account of the withdrawals by Buhs and Wright. At the hearing respondent conceded that the $50,000 proceeds of the fidelity bond was not taxable income; and he also conceded that petitioner was entitled to a deduction of $50,000, and no more, on account of the alleged embezzlement. Petitioner seeks a deduction of $130,000 as claimed on its amended return. The parties agree that the basic or starting figure in determining *228 the amount of petitioner's loss is the $201,000 withdrawn during 1942 and unaccounted for at December 31, 1942. Both parties reduce this basic figure by the $50,000 received on the fidelity bond, and arrive at a figure of $151,000, as the amount not compensated for by insurance. It is from this point that the parties take divergent paths in computing the amount of petitioner's loss Respondent contends that the value of the property assigned by Buhs in restitution for his withdrawals was $101,000, so that petitioner's loss is only $50,000. Petitioner contends that the value of that property was only $21,000, so that the amount of its loss is $80,000 more than respondent concedes, or a total of $130,000. Respondent, in effect, stands on the first report made by Lybrand, Ross Bros. & Montgomery in their audit of Engineering's books. Petitioner stands on the second report made by the same firm some nine months later. We have set forth the results of the two reports in our findings, and the reasons given by the accountants for their adjustments. Our findings show that these adjustments were fully provided for in the first report on Engineering wherein the accountants listed certain items *229 as unsettled at the time the report was prepared, which items would affect Engineering's financial statements upon settlement thereof. One such item listed in the first report was Engineering's liability on end-connectors and propeller forgings. The second report points out that several major adjustments had to be made to Engineering's accounts in connection with its 1942 business transactions under the Navy contract. In order to give effect to those 1942 operating errors, the accountants had to revise Engineering's balance sheets and financial statements as of December 31, 1942. As shown in our findings, such retroactive adjustments reduced Engineering's available assets from $101,000, as first computed, to $21,000; and it is upon the basis of this reduction that petitioner claimed its increased loss. If it can be said that the events which caused those retroactive adjustments occurred prior to December 31, 1942, and did not occur thereafter, while petitioner was operating Engineering as a subsidiary, then the first financial statements did not properly reflect the assets available to reimburse petitioner for Buhs' unauthorized withdrawals; and petitioner is entitled to deduct not *230 a part of but the entire amount of the loss sustained. Sec. 29.43-2, Reg. 111. [2] At the hearing a member of the accounting firm which audited Engineering's books, and who was in charge of making both reports on Engineering, testified, upon crossexamination by respondent's counsel, that there were no subsequent events which affected those retroactive adjustments. He further testified that all events had taken place during 1942 upon which their retroactive adjustments of Engineering's accounts were based. This testimony stands uncontradicted and is abundantly supported by other facts and circumstances of record. *231 One further argument of respondent merits comment. He contends that petitioner's officers and directors authorized Buhs' with-drawals. This contention apparently stems from one of Buhs' defenses at his criminal trial, to wit, that his connection with Engineering was well-known to Epstein and the officers of petitioner, and that they authorized his withdrawal of funds from the petitioner. This argument is not persuasive. If respondent believed his own argument, he should stand on it and refuse to allow any loss deduction for 1942. Instead, he concedes that petitioner is entitled to a $50,000 loss deduction. Furthermore, Buhs' assignment of his stock in, and his claims against, Engineering states that the transfer was made as part consideration of his obligations to petitioner "for its funds used by me, illegally and unauthorized." In addition to this signed statement by Buhs, the record contains the unqualified denials of Epstein and Smith that they knew of or authorized Buhs' withdrawals. In the face of such affirmative evidence, we would not be justified in holding that Epstein, and petitioner's officers and directors, authorized the withdrawals and the use of petitioner's funds *232 in financing Engineering. It is interesting to note in this connection that none of the many investigations that were made as a result of the Buhs' matter involved petitioner's other executives or directors with Buhs' misdeeds. In the light of the facts of record on this issue and respondent's regulation, petitioner was entitled to establish, and has established, that it sustained a loss of $130,000 from Buhs' and Wright's unauthorized withdrawals of its funds during 1942, and is entitled to deduct such loss under section 23 (f) of the Code. Legal Expense Issue For the taxable year 1943, respondent disallowed $22,000 of the total deduction claimed by petitioner as legal and professional fees upon the ground that this "amount claimed by you as Special Legal Expense" is neither ordinary nor necessary business expenses. The evidence shows that this was the amount of the bill submitted to petitioner in 1943 by Merlin Wiley for special services rendered. Wiley testified that he devoted his time in 1943 almost exclusively to petitioner's problems. He represented petitioner in the investigations of the Buhs matter conducted by the F.B.I., the New York Stock Exchange, the Securities *233 and Exchange Commission, and the state authorities. He represented petitioner before the Alcohol Tax Unit and the Department of Justice, successfully resisting a claim against petitioner for nearly a half a million dollars. These were matters intimately connected with the day-to-day operation of petitioner's business which required the services of counsel. The fee charged by Wiley for almost a year of his services and advice on two such important matters does not seem to be an unreasonable charge in view of his reputation and ability which respondent freely admitted. In our opinion petitioner has established that this item is a deductible expense under section 23 (a) of the Code. Decision will be entered under Rule 50. Footnotes
1. SEC. 23 DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(f) Losses by Corporation. - In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.↩
2. Sec. 29.43-2, Reg. 111, in pertinent part, reads as follows: "* * * If subsequent to its occurrence, however, a taxpayer first ascertains the amount of a loss sustained during a prior taxable year which has not been deducted from gross income, he may render an amended return for such preceding taxable year including such amount of loss in the deductions from gross income and may file a claim for refund of the excess tax paid by reason of the failure to deduct such loss in the original return. * * * A loss from theft or embezzlement occurring in one year and discovered in another is ordinarily deductible for the year in which sustained."↩